Thank you and good morning, Your Honors. As Director of the Appellate Litigation Clinic at the University of Virginia School of Law, I'd like to introduce to the Court this morning two third-year students who have satisfied the practice requirements and who have our clients' consent to argue the appeal this morning. Ms. Megan Keenan, who will handle the opening argument. Mr. Joe Charlay will handle the five-minute rebuttal. Thank you. Good to have you here. May it please the Court, my name is Megan Keenan and I'm here on behalf of the appellate in this case, Ms. Felicia Strothers. This Court should vacate the lower court's finding that Ms. Strothers failed to make a prima facie case of retaliation for three main reasons. First, Ms. Strothers was opposing activity that she both subjectively and reasonably believed was unlawful under Title VII. Second, Ms. Strothers placed the City of Laurel on sufficient notice that she was engaging in protected activity when she told the City that her supervisor had subjected her to, quote, harassment, quote, humiliation, and a, quote, hostile environment since day one. And third, we know that protected activity was causally linked to Ms. Strothers' termination because Ms. Strothers was fired within 24 hours of her second instance of protected activity on the record. And so I'll start with the first of those three things, that Ms. Strothers was opposing activity she both subjectively and reasonably believed was unlawful under Title VII. Because Section 704A of Title VII forbids employers like the City of Laurel from retaliating against their employees based on their opposition to unlawful employment practices under Title VII. And this Court has held in Laughlin that that kind of protected activity or opposition to unlawful activity can take place in the form of informal grievance procedures or even just voicing one's opposition to unlawful practices. Ms. Strothers engaged in that kind of protected activity on at least two occasions for the purposes of this inquiry. First, on February 26 and her memorandum to her employer where she describes in depth at least one instance of harassment that she endured. And second, on March 6, where she requested that same member of the City of Laurel, Mr. Pete Peeringer, that she could formalize her grievance against her harasser, Ms. Corrine Kuback. And we'd remind the Court that this Court does not have to find that the actual activity about which she complained, that you'll have to find that it was unlawful under Title VII. Rather, as this Court held in Navy Federal, all you have to find is that she reasonably believed that the activity about which she complained was unlawful under Title VII. That's enough to move forward at the primary stage of retaliation claim. And so here what we're looking to is whether Ms. Strothers subjectively and reasonably believed that the City of Laurel had subjected her to unlawful treatment and that that's the activity she was opposing in this case. Here, Ms. Strothers had made that showing based on her pleadings below. And the first instance that we would direct the Court's attention to is the one on February 21, where Ms. Kuback physically grabs Ms. Strothers without her consent. We think that instance is especially important because of this Court's precedent in Boyer-Liberto, an en banc panel that all of your Justices, your Honors, joined. In that case, the Court found that, quote, physically threatening or humiliating instances of harassment, even if they're isolated and standing alone, are enough to create a hostile environment for the purposes of Title VII. Because those kinds of instances of harassment that are physically threatening or humiliating are extremely serious in this Court's language. And that's exactly what Ms. Strothers alleges happened on February 21. In that memorandum, in Ms. Strothers' own words, she describes that Kuback, quote, aggressively lunged at me while biting her lip as if she wanted to strike me or wanted me to strike her in my defense. And then she goes on to describe her, quote... So, okay, let me just stop you there. So that suggests an assault, perhaps, but how is that tied into a Title VII violation? Yes, Your Honor, because there's, for a number of reasons, but there's independent evidence on the record to suggest that race was the motivating factor behind this kind of differential treatment that Ms. Strothers was subjected to. And that comes from a number of different employees within the city of Laurel. Early in Ms. Strothers' time at the city, two separate employees approached her to say that Korean Kuback, the supervisor who's causing these problems for Ms. Strothers, quote, doesn't like black people. That's a quote from several different employees in the record, Mr. Oliver Welford and Ms.  And that's said to Ms. Strothers from the outset. That basis colors that later on, allegations of differential treatment, because when she's treated differently and the reason she's... Was that... The district court judge have... Was that highlighted in the record for the district court judge? That seems new to me. Your Honor, it wasn't highlighted because the district court dismissed on the idea of sufficient notice, not on the reasonableness of her belief. And so it didn't dive into whether her relief was reasonable or not. This goes to reasonable belief and not to sufficient notice. The notice issue is what the court below found upon. So that's why this might seem new, because it was contested in the briefs. So why aren't we focusing on the notice issue? We can certainly turn to the notice issue, Your Honor. And we think that here, sufficient notice was given, again, for two independent reasons. First, that Pete Pieringer, who's the communications director at the city of Laurel, had an ongoing line of communications and by his own testimony in his deposition, an open line of communications with Ms. Felicia Strothers throughout her five months of employment. There, in the earliest months of her... Strothers approaches Pieringer to ask why she's being treated differently in the office, why Kubek doesn't like her. And Pieringer's response is, in Ms. Strothers' deposition, quote, that Kubek wanted someone of a different race to have Ms. Strothers' job. When that's the answer... Can I ask you a question about that? Absolutely. Was that fact argued to the district court under this kind of rubric of notice? This is why the city was on notice because of this statement? Because I didn't see that in the summary judgment papers. And I'm a little concerned that it's sort of hard for district court judges. They've got a million facts and then they've got arguments and you're supposed to bring to their attention which facts you want them to consider under which arguments. Your Honor, so I don't have the exact page number, but I know it was argued in the briefs below from Ms. Strothers. I don't believe that he highlighted it in the opinion. But you think it was argued not just to show your first argument, that she reasonably believed this was a matter of racial discrimination, but also that you argued to... When it comes to whether or not the city was on notice, this is something I want you to consider. I do, Your Honor. Although, to be clear, I don't know that it was separated out on the reason or else of the belief and the notice arguments. I don't know how clearly they were separated in the initial briefs, but I do think it was argued in both. And especially because Peeringer is the person who receives that memorandum that is very clearly raised that describes harassment, humiliation, and hostile environment. That's the same person who mentions race to Ms. Strothers voluntarily. And we think that's an especially important fact in the record because it's not as if Ms. Strothers comes to the director and says, I have a race-based issue. It's even stranger than that. She comes and says, I'm being treated differently. This woman doesn't like me. What's going on? And he says, she wanted someone of a different race to have your job. We think that kind of evidence is especially strong because it makes it even more objective and it shows that that employer is on notice of the racial dimension of their relationship when he receives... So you're not arguing that the complaints on their face without that statement would put the city on notice. You need that statement. Your Honor, I would think that Your Honors don't have to hold that the complaint alone would be enough, but I think it could based on the precedents set by this court in Ecole. In Ecole, this court has found that the word harassment is a sufficient term of art to place the employer on notice that an employee is engaging in protected activity, even without the kind of, quote, magic word like sex in Ecole or like race here in Ms. Strothers' case. And that's because courts and employers alike recognize those terms of art that are especially associated with Title VII, including what this court has already found to be the word harassment. But the word hostile environment was also used in that complaint and it's equally as associated with Title VII. And the word humiliation was used in this complaint. Do you think the employer would have known what kind of discrimination she was complaining about from this? Like whether it was age, because I know she has an age discrimination complaint, or gender or race. Does it matter? So, Your Honor, I don't think that it matters because the question in a retaliation case is whether they fired her based on opposition to Title VII prohibited activity. And so, regardless of the actual basis of it, I think that if they fired her because she was engaging in protected activity, it doesn't matter which basis they thought. Yeah, but in terms of whether you can say the city was reasonably on notice, it's sort of weird, right? Because I'm reading, I think when you read the whole thing in context, it sort of seems like she's complaining about a really, and I don't want to underestimate how awful this is, but a really awful boss who's just like nickel and diming her about every darn little thing and making her life quite unpleasant at work. But I feel that if I was just looking at this letter and I were the employer, I'd be kind of hard-pressed to see more than that. And she seems particularly, you know, she wants an investigation, but not an investigation into discrimination. She wants an investigation into what kinds of pants she was wearing on Friday the 21st and Friday the 28th. And so, I mean, this sounds like a terrible work situation, but I'm not sure that I would get more than that out of this as an employer. You know, I think that might be true based on the complaint alone, although this court has already held that harassment should be enough to trigger an employer, but... I think there were, in both of the cases you're talking about, there was something more than the word harassment. There was either the person getting the complaint was, in fact, one of the people doing the harassing, so you ought to be able to impute to him what's going on. And in the other one, it was that the employer immediately says, call EEO. So we know that they read it that way. So it's actually that second case that I think is most similar here. That's Burgess, which I believe that Diaz was the authoring opinion. But I think that that case is particularly important because it shows why Peeringer's notice and why him injecting race into the conversation is just as important. Gotcha. I think that's right. And that's why this case is stronger than Justin Acoli, the four corners of the document where the words harassment and hostile environment, even if that might be enough, we have more evidence in this case to show that the person who received that memorandum is the person best equipped to know that race was at issue here. And that's because from the very beginning, Ms. Struthers is talking to Peeringer about the selective treatment that Ms. Kubek subjects her to, whether it's in the light most favorable to the plaintiff, of course, manufacturing a false allegation of tardiness, which is 30 different allegations that are contested here in the record about tardiness, whether it's the monitoring her every movement, whether it's even asking to go to the bathroom, which she does not do that for any of her own employees by Kubek's own admission, whether it's this physical altercation between the two of them in February. All of these are told to Pete Peeringer, who is the same person who voluntarily mentions that the thing that's causing this kind of friction is race. Let me ask you, with respect to that statement and the district court's analysis of that statement at page 10 of his opinion, he says in response to that, that, quote, a hiring decision maker's preference for one candidate who happens to be white over another candidate who happens to be black by itself cannot support a reasonable inference of racial bias. And he goes on to talk about other evidence in the record suggesting some innocent connotation that might attach to that statement. What's wrong with that statement? We think that even if that's one possible reasonable inference that somebody could draw from the statement that Kubek, quote, wanted someone of another race to have Struthers' position, the reason the district court went wrong there is that it's not undisputed in the record that that's the meaning that the record shows. And at summary judgment, there has to be no genuine dispute about material fact, and this may be the most material fact in the record of whether the employer injected race into this conversation. So where that kind of dispute exists, this case should not have been dismissed below for summary judgment, because that's exactly why it needs to go to trial, to suss out what was said and what was meant by that kind of a statement. So that's where we think in particular that the district court was wrong in that analysis. We also think that the complaint in Ecole, Judge Harris, I believe you mentioned earlier that the employer knew about the background situation in Ecole, but we don't think that exactly squares with the opinion in Ecole as written. While they do mention the upwards of 12 instances of harassment that were exceptionally severe in Ecole's case, that's all in the context of the hostile work environment claim, not the analysis of the retaliation claim in Ecole. There what the court focuses on is the protected activity at issue, which looks a lot like the one here, where Ecole, the plaintiff in that case, submits to her employer a letter that complains mostly of general notions of fairness, but also includes the word harassment. And that's where this court found that the use of the word harassment was enough to place the employer on notice, even though the person who received that memorandum did not have the background knowledge that Pete Perenger had in this case. There is a throwaway line in Ecole after the analysis that said, surely Stewart, who was the harasser in that case, would have known that he was harassing somebody, but we don't think Ecole can be taken for the proposition that the harasser should have known they were harassing somebody. That's not squared with the rest of the analysis in Ecole's case. It's more about the word harassment, and that that places the city on sufficient notice. And so, your honors, as to that third main issue, that protected activity was causally linked to her termination, we think that here is especially clear on the record, and based on this court's precedent. Because this court has held that very little evidence of a causal connection is required to establish a prima facie case of causation, and that's the only burden at issue on appeal here. Specifically, this court has held in Williams against Cerberonics that the temporal evidence, quote, certainly satisfies the less onerous burden of making a prima facie case of causality. And in Price against Thomas, that temporal evidence was as far as 36 weeks between the instance of protected activity and the actual adverse employment action. Here, the entire employment of Ms. Scrothers with the city of Laurel was only 22 weeks, so we're certainly within that causal connection. And the actual protected activity is much closer. We're not just looking at the 22 weeks. The first instance of protected activity that's contested here happens on February 26th. The second on March 6th, and then 24 hours later, she faces that adverse employment action. And so we think the temporal evidence is far closer than is necessary and establishes that third point. In fact, I think the district court agreed with you that if you got to that trunk of the analysis, you'd likely win. Yes, Your Honor. And that's why we think it's important that notice is the focus and not causation, or especially not the pretextual reasons that the city cites in its brief about tardiness as the reason. The district court, as well, also seemed to agree that it was persuaded the reason proffered by the city of tardiness was pretextual. And so that's why we're only focused on the prima facie stage here. Those later stages about the city's actual reason come at the second and third stages of the McDonnell-Douglas framework. And that would be something that this court could remand to the lower court for further consideration of. But it's not pertinent to the analysis here. That's why we'd ask this court to reverse and remand if there are no further questions, Your Honor. Thank you, Captain. Mr. Karpinski? May it please the court, Kevin Karpinski on behalf of the city of Laurel. I'd like to begin by complimenting my colleagues who've done an excellent job representing Ms. Shruthers. I do a fair amount of appellate work, and the briefing that was done by both attorneys was exceptional. And so I'd like to extend my compliments on that issue. Your Honors, I would respectfully submit the district court correctly concluded that prongs one in three of a prima facie case were not satisfied. Namely, that an employee under an objective standard would reasonably believe that they were complaining of racially harassment and that the employer was not on adequate notice that really what Ms. Shruthers was complaining about was based in race. And so I want to start with what Judge Harris mentioned in terms of the February 26, 2014 memo. It talks about the jeans incident, and it talks about other things such as not having city employees at her desk, she can't leave her desk, she feels like she's more like a I would respectfully submit to you the detail upon which Ms. Shruthers went to in identifying issues she was having in the workplace is even the best evidence that the employer would not know that this was based upon a racial component because Ms. Shruthers goes through in great detail about the issues she's having, I think as Judge Harris said, with what she viewed to be a difficult boss. But, you know, that is, I mean, it's an interesting issue, which is are we to then just presuppose that because one is of one race and another person is of another race, that when they don't really articulate any race-based reasons that the employer would naturally lead to the conclusion that it is somehow racially motivated. The same as if we were to suggest that you had a supervisor which was of one sex and a subordinate of another sex, that somehow it was gender-based, or you had a younger supervisor and perhaps you had a Well, in a vacuum perhaps, but you've got the statement of the supervisor injecting race into the equation. Well, you do and you don't, Your Honor, in the sense that when Mr. Perringer was deposed, he did say, he was asked the question specifically whether anyone objected to Ms. Shruthers being hired, and he indicated that no one that was part of the interview panel indicated that there was any objection to Ms. Shruthers being hired. How does that counter the statement that her immediate supervisor preferred someone of a different race? Well, the context, I think, is Ms. Perringer was making, Mr. Perringer was making the statement that he, that Ms. Kubek preferred another candidate who happened to be of a different race, and that That seems a very odd statement to make, out of the blue. It's maybe not so odd to say that she preferred another candidate, but then to highlight the fact that the candidate happened to be of another race, at least arguably injects race into the equation. Why isn't it for a jury to decide exactly what she meant by that, or he meant by that? Well, again, Your Honor, I think what Ms. Kubek said in her deposition was, I had another, I preferred another candidate, articulated Okay, that sets up a battle of witnesses. You got Kubek saying one thing, you got Perringer saying something else. Classic jury question. Well, Mr. Perringer didn't say that he said that Ms. Kubek preferred a candidate of another race. During Mr. Perringer's deposition, his testimony was simply that Ms. Kubek preferred another candidate who happened to be white. What's so weird about this, and I spent so much time on this part of the deposition, because you can read the statement all different ways. It could be that the plaintiff is saying, he told me that Struthers wanted to hire someone else, and now me, plaintiff, I'm telling you that person was white. Which would be entirely different than if what she's saying is, he told me my supervisor wanted to hire someone white, and that's how she found this other person. But what strikes me about the deposition is that she makes this incredibly ambiguous statement, and then whoever's questioning her tries to clean it up. Like, really? Is that what you mean? And she still doesn't clarify it, and then they just move on. So I think we're just stuck here with this incredibly ambiguous statement. It didn't get cleaned up in the deposition. So aren't we stuck with having to read it in the least benign light in this posture? Well, I would say, Your Honor, that also Ms. Struthers, when we were discussing later on, where she said she had a meeting in November of 2014, and this was a meeting where it was Mr. Perringer, Ms. Struthers, and Ms. Kuback, and this was the meeting where Ms. Struthers says, you don't like me, and I don't know why you don't like me. So there certainly was no indication in November of 2014 that she really had indicated any reason that was race-based for why. So is your argument, okay, this statement is ambiguous. You could read it in either a benign way or a non-benign way. And in light of the other record evidence, no reasonable jury could read this in the non-benign way? Is that what you're saying? I am, Your Honor. And I'm saying that because you have Mr. Perringer's testimony that no one objected to Ms. Struthers being hired. You have Ms. Kuback who testified, yes, I did prefer Ms. Blankenship as a candidate. I didn't have an objection to Ms. Struthers being hired. I just thought Ms. Blankenship was a better candidate and preferred her as a candidate for the reason she was an existing city employee and thought she would be better suited for the job. But keep on going to Judge Harris' question as to what about the context of the relationship of the job and put that with how she treated her from day one. I'm sorry, Your Honor. How Ms. Kuback treated Ms. Struthers from day one when she got the job. Isn't that a part of the context too? Well, it is part of the context. And how did she treat her? She said first day violated the rule that had, is that disputed that they had agreed that 9.05 would be her arrival time? No, Your Honor. That's not disputed. That's not disputed at all. Right. But she logged her in every day. No evidence that she didn't log in anybody else's. Well, yes, Your Honor, that's true. But that's a little misleading in the sense that Ms. Kuback doesn't really supervise anyone else. So she wouldn't, I mean, we're not talking about a big department here. When you're talking about the communications department, you have Mr. Perringer, who's the director, you have Ms. Kuback, and you have Ms. Struthers. So it's not as if Ms. Kuback had supervisory authority over other individuals where she would be doing that. When Mr. Perringer was deposed, he said, I had every expectation that Ms. Kuback would keep track of Ms. Struthers' time and her work performance. And what Ms. Kuback, and she admitted in her deposition, Your Honor, is, you know, she really didn't have much supervisory, she never had much supervisory experience. And so she began logging in when Ms. Struthers would show up to work, based upon the advice of Michael Green, who was the human resources person, that said, if she's indeed showing up late for work, then you need to go ahead and document. In inexperienced... But wait a minute, she started from day one documenting. No, well, she went back. She did go back, Your Honor. Well, she went back and filled, she backfilled. Well, backfill certainly doesn't sound like a very positive term, Your Honor. Well, unless you wrote it down in the first instance, that's a whole lot. It would be hard for me to go back and say, what time did you want to see a month ago? I remember that day, that was Monday, they came here at 12.01. It had to have been, again, the spend, and for the other one, the bathroom. She had to, this is undisputed, I think. She had to dispute this, that I want you to tell me you get permission to go to the bathroom, and when you come back, I want you to tell me you're back from the bathroom. And the district court said it found no racial epitaph or inferences in this case. Do you realize how offensive that is? I mean, it has some context. I hate to go to the history of it, but going to the bathroom for black people historically, that was a big thing. You know, yes, boss, can I go to the bathroom? No, hold your water until you get someplace where we allow you to do it. That's very offensive. Nobody said to do that. And then document when you come back. So your very personal biological functions, you got to put somebody on notice, I got to pee. And then when you come back, say I'm finished, and I'm back at my desk, you don't find that to be inferences or offensive for race? I don't find it to be offensive for race. I find it to be an exceedingly difficult. It's not offensive for any human being, but, yeah. And that's kind of my point, Your Honor. I think it's indicative of a difficult boss. But in the context of it, I heard the boss saying it, she wanted a white person for this job anyway. That's what he told her. This is notice on steroids. She didn't inject it. The person who she reported to said, well, okay, you know, she wanted a white person anyway, but a job, you got to know that. I mean, he said that. And then when she said, you know what, I'm going to file a formal complaint, they fired her in how many days after? How many days after she said, I'm going to file a formal complaint, they fired her? On March 5th, Your Honor, she said she wanted to file a grievance. Was it two? Actually one. Oh, better. And what is the city's position on why she was fired? She was fired for not showing up for work on time. And that was what Mr. Perringer said. He said the city manager and the mayor's expectation was, and I think it was, if you're not there five minutes early, you're late. So that's what you're sticking with. And I don't, that sounded snide. But so it's not any workplace problem because the letter, a performance problem, the letter also alludes to performance problems, but the city's position is that it was all about the targets. Yes, Your Honor, I mean, Mr. Perringer clearly stated when he decided to let her go during her probationary period, it was clearly based upon the fact that she wasn't showing up. So it's too late for you guys to just say, you know what, we fired her because she complains all the time, and she's having this fight with her supervisor, and as between the supervisor and the probationary employee, we're picking the supervisor. That's why we fired her. But that's not, it's too late for that. It's all about the tardiness, which happened to come the day after she complained, wanted to formalize her grievance. And, Your Honor, I guess the point in terms of the grievance is she, Ms. Struthers, had previously indicated she wanted to file a grievance regarding her performance evaluation, her three-month performance evaluation. And when she did that, she didn't say I'm basing that on the fact that I believe I'm being treated unfairly on the basis of my race. In the March 5 email, which I can see Mr. Perringer couldn't say whether he recalls getting it, and obviously if he doesn't recall getting it and he doesn't dispute getting it, he can't recall whether he read it before or after the decision was made to let Ms. Struthers go. So I can see that. But the grievance itself, as Judge Gregory has indicated and Judge Harris, you've indicated, I think it's got to be put in context. I mean, the emails leading up to this are all about whether Ms. Struthers' jeans or leggings or whatever met the dress code for the city and whether other individuals were being treated, you know, they were permitted to wear clothes that were not in conformity with it. I will say sort of in line with what Chief Judge Gregory was saying, there is sort of a rich literature about dress codes being enforced unequally against women of color too. So I'm not saying anything. I'm asking whether that factors in at all to how an employer should have taken this letter, that when an African-American woman says, look, everybody else gets to wear leggings and I don't get to wear leggings, that that might set off alarm bells. You know, Your Honor, my review of the record is that actually what her complaint was is that Anna, the receptionist, who's a Hispanic female, was permitted to wear tight clothes and that her complaint was that Ms. Mills, the city manager, had indicated that although the clothes she was wearing were appropriate in the sense they were jeans, they were too tight. You know, it's a very difficult thing, Your Honor. You know, for me, it would not. I mean, I wouldn't sit there and view that as a race issue if someone were, if I were getting emails saying, you know, I think I should be permitted to wear this and you have Mr. Perringer saying, okay, I'm going to look into that issue and then you get sort of a cryptic email that says, I want to file a grievance and there's nothing that's said about what exactly that grievance is going to be. I would not reach that conclusion. I mean, and obviously the district court didn't reach that conclusion. You're sort of educating me that that has been historically an issue. I'm going to be very candid with you. So, you know, I don't believe that was, you know, that entered into the equation because the reality is that I don't think, you know, notwithstanding the fact that Ms. Struthers did file complaints, that anything really was of the kind of indication that it was really racially motivated. And, you know, in the other cases, the Ocoli case, I mean, those cases are, they're much different in the sense that, you know, Ocoli, there are complaints being made to the Community Relations Committee. Chief Judge Gregory, in authoring that opinion, said there certainly was, maybe there was evidence that Mr. Stewart was on notice of, you know, he's the harasser and he was aware that the complaint had been forwarded to him before the decision had, you know, the notice had been provided that she was going to be fired in Ocoli and in Burgess. You know, those facts were, you know, much different. I do think you have to view all these cases. But looking at cases, though, doesn't this case, if we follow your argument, doesn't it potentially incentivize people to fire people right away? Because in terms of retaliation, oh, well, you know, first letter, and whether you're punishing someone, she's not, she wasn't looking for a race question. She tried to find, well, what is it about me different? But when she, her boss comes in and say, well, you know, this is a person who had a view, and he mentioned a white person who reported it. And then she said, well, I'm going to formalize it. If you fire somebody quick enough, then maybe they won't be able to give you a notice of what I really mean, isn't it? Especially in this case when the district court agrees that it was a specious reason for firing her. And he said, if it got to that prong, I would agree. So knowing that and the fact that he fired them one day after they said they were going to file, this makes you say, look, fire them quickly. It's like the old railroad thing. Before we had statutory wrongful death, railroads would go around and you cut the slit in the throats of people who survived it because there was no survival action. You know, there was no action for wrongful death, but to survive you had one. So that's why wrongful deaths now become statutorily the same people. Isn't that what you're saying? Uh-oh, she's saying, now I'm told about this, let's wait. She might amend that memo now and put in more so if you fire her quick enough, I don't get the notice and you come and say, well, I didn't have a notice. That was vague. But here you don't have it because you have a smoking gun. The person she was to give notice injected race himself. Well, but, Your Honor, if that were the case, then when Ms. Struthers indicated that she wanted to file a grievance after her three-month evaluation, then logically that would have been, if they wanted to get rid of her on the basis of her filing, wanting to file a grievance, that would have been the first opportunity they could have done that. The bottom line is that she was a probationary employee ending the time of her probation and a decision was needed to be made whether they were going to make her a permanent merit employee or whether they were going to go ahead and let her go. And, you know, as is often the case for counties and municipalities, they use that probationary period to determine whether the employee is progressing. And that's, you know, that's why I understand what Your Honor is saying, but the reality is if it was simply because she wanted to file a grievance, she had already requested to file a grievance previously. How did she get such a glowing evaluation from the employer, the manager? Glowing, it was glowing. The recommendation was she left and she was fired. She has performed beautifully above and beyond. Just wonderful. I couldn't imagine anybody better than you. You're going to be wonderful. I hope you can get. Was that the case? It was a glowing letter. You're right, Your Honor. And Mr. Perringer, he said, I like Ms. Struthers. No, it wasn't just like. She was performing her work well. Not about like. He said performance of the work. Right. And so he was. He told me that we use this period to make sure that whether or not you're going to be a good employee. But then you fired her and said she was doing a great job. I mean, it's just incredible in this case to say that you said she was. And he wouldn't even sign that evaluation that CUBIC did, did he? He didn't sign it, Your Honor, because it wasn't a formal evaluation. So he wouldn't be the one. He agreed with it. He reviewed it. But, no, because it's a three-month evaluation to try and improve your performance during your six-month probationary period. So it's not a formal evaluation. It's basically a work plan to address whatever concerns the immediate supervisor had. But I don't dispute, Your Honor, that Mr. Perringer wrote a letter of reference for Ms. Struthers. He certainly testified that he himself liked Ms. Struthers. He's also the person who made the decision, Your Honor, that Ms. Struthers needed to be let go. So the decision-maker here is certainly on record as saying, I liked Ms. Struthers. I didn't have any issues with Ms. Struthers. But, however, the city's policy is you need to show up on time. She herself, Ms. Struthers, acknowledged that she was not showing up on time. I've got someone who. She acknowledged she wasn't showing up on time. Oh, yes. Ms. Struthers admitted that she. How many days did she say she was late? She said she was ill. She said one day, I think, her child, because of a snow day. What was the other time? I think she had three or four times. Three or four times she was, what, 10 minutes late? Three times. And, again, Your Honor. And the lady who, her supervisor, day one started writing down. Well, you said it wasn't day one. She went back and remembered the other day. Well, Your Honor, again, that may be what you view to be a draconian work requirement. But it certainly was very clear from everyone who got deposed that that was the requirement for the city of Laurel. You are to be at your desk, seated, ready to work at 9 o'clock. But is it undisputed that she had an agreement that 9.05 was her time? For a brief period of time of a month or so. And then after that period of time. That's undisputed in this record? That's undisputed, yes. And what was the brief? When did it end? What does brief mean? Brief is six months to some people. No, no, no, no. She was told two weeks first that she had to go ahead and get childcare, get her issue resolved within two weeks. At the end of two weeks, it was extended another two weeks. Doesn't the record also show that the employer didn't even honor that two-week period? I respectfully disagree, Your Honor. Actually, I think the record shows that the employer extended the two weeks to a month. That's actually what happened. The employer respectfully honored the extra time that she was allowed to take care of her child. Is that your statement? My statement is that for one month, she was permitted to come in late with the understanding that after that one-month period, she would be at work, on time, and ready to work at 9 o'clock. And I guess what I'm asking is during that one-month period, the employer honored that agreement? Yes. That was not held against her. Can I ask you a question? No, go ahead. Sure. I'm sorry, this Piringer statement I think is so important to this case. It's just a question about the way the litigation unfolded below. So Ms. Struthers is deposed before Mr. Piringer, is that right? Correct. Did anyone ask Mr. Piringer seriously what exactly did you say to her in his day? Well, I feel bad. I've been sort of skimming because I can't find it. But is it in there? Did someone ask him about that? No, Your Honor. Okay, so that statement was never clarified in depositions. Okay. I don't believe it. Your Honor, I'm preparing for oral argument. I looked as well to see whether there was any sort of clarification when Mr. Piringer was deposed on that issue, and I couldn't find it either. Thank you. Thank you for your time. Thank you so much. Mr. Shurley. Thank you, Your Honors, and may it please the Court. My name is Joe Shurley, and I'm here on behalf of the appellant, Ms. Felicia Struthers. I would like to briefly correct two points in fact regarding Ms. Kubek and then briefly rebut three points of law. Ms. Kubek, in her deposition, admits that she managed four employees in her time at the City of Laurel, two of which were probationary. She also admits that she surveilled the tardiness attendance of no other employee but Ms. Struthers. So Ms. Kubek herself admits to differential treatment on this matter. Second, Ms. Kubek, in her deposition, states that Mike Green, the head of human resources, is the one who told her to start surveilling when Ms. Struthers was coming in on time. But Mike Green, in his deposition, says that that was a month into Ms. Struthers' employment, and Christy Mills, the city manager, says that she's the one who told Kareem, excuse me, Kubek, to go to Mike Green, and she also corroborates that that was one month into Ms. Struthers' employment. So that means that the November 25th memorandum that Kubek submits to Peringer that starts from the first day of Struthers' employment was either backdated with information that she had not kept up until that point or that she had chosen on her own volition to surveil Ms. Struthers. In terms of the points of law that I would like to briefly rebut, Ms. Struthers definitely has a reasonable belief here in the light most favorable to her based on the record, and if I might read a few things from the record. Beyond Peringer being the one himself to voluntarily inject race into the conversation, Ms. Struthers has alleged that Joan Anderson and Oliver Wilford both attested to her that they had run-ins with Kareem and, quote, felt that she didn't like black people. Joan Anderson told Struthers that Christy Mills, the city manager, knows about her individual history with Ms. Kubek. Oliver Wilford said that he and his wife were treated like scum and no one would ever do anything about it. And Ms. Anderson tells Ms. Struthers to go to Councilmember Smalls, the only African-American member of the City Council of Laurel, with her grievances, and Ms. Struthers says in her deposition that she tells Councilmember Smalls as much as she's told Pete Peringer and that Councilmember Smalls told her, I'm going to talk to the mayor because this has gotten out of hand and I don't want to have a discrimination suit on our hands. And then in Smalls' deposition, when asked about this, he says, yes, it's possible that he said that. So it seems like in the light most favorable to Ms. Struthers that she has a reasonable belief here. In terms of notice, once Peringer has voluntarily injected race into the conversation, when the city brings up Ms. Struthers' statements that are more focused on general identity aspects of her statements, that's because those conversations happen after Peringer has injected race into the conversation and when Ms. Kubek is present. And so Ms. Struthers is reasonably assuming that Peringer understands the racial dimensions of her complaint when she's making it more identity-focused because in posting grievances to the city, Ms. Struthers' intention at that point is for remediation of the situation, not to set up Title VII litigation. The third thing is the notice that's in the February 26th memorandum. And if I could just read some extra statements that were in the memorandum. She incorporates every complaint by saying there have been several incidents reported to date leading up to this incident. This is on JA574. She says that it has been an uncomfortable, hostile environment since day one, which also incorporates many other complaints. And then she alleges in between that memorandum and the email asking to formalize her grievance in a period of emails between those two dates, she's asking Peringer to conduct an investigation about the differential treatment given to her based on workplace attire and tardiness. So I think all of these allegations taken together in the cumulative record shows that she has put the city of Laurel on notice. And if I may briefly conclude, we ask that you reverse the grant of summary judgment and remand for proceedings in pursuant of that. Thank you. Thank you. Mr. Braga, I want to note that you were court-appointed as well, and thank you on behalf of the Fourth Circuit. We depend on your fine work and you and other court-appointed lawyers, and even more so that you brought some great company with you today, some wonderful, and your school is in Charlottesville, is it not? There would be Wahoos. Well, I must say to you, Northlands, I have on your colors, but these are Virginia State colors. Well, thank you. You did a fine job. You quitted your Wahoos very well. Thank you so much. We'll come down to recalcitrant and proceed to the final case for this appointment.
judges: Roger L. Gregory, Albert Diaz, Pamela A. Harris